UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| REZA TORKZADEH, an individual; and KOROSH TORKZADEH, an individual,<br>Plaintiffs,<br>v.<br>GLADIATE TECHNOLOGIES INC., a Delaware corporation; PERRY SKOUTELAS, an individual; and DOES 1-10,<br>Defendants. | Case No.: 8:25-cv-01264-MEMF-JDE<br>**ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION TO DISMISS [DKT. 33]** |

Before the Court is Defendants' Motion to Dismiss ("Motion"). ECF Docket No. ("Dkt.") 33. For the reasons stated herein, the Court GRANTS IN PART and DENIES IN PART Defendants' Motion to Dismiss.

## I.

## BACKGROUND

### A. Factual Background[1]

Plaintiffs Reza Torkzadeh and Korosh Torkzadeh (collectively, "Plaintiffs" or "the Torkzadehs") are citizens residing in Orange County, California. FAC ¶¶ 3-4. Defendant Gladiate Technologies Inc. ("GTI") is a Delaware corporation with its principal place of business located in Texas, and defendant Perry Skoutelas ("Skoutelas") (collectively, "Defendants") is a citizen residing in Texas and/or Minnesota and serves as GTI's Chief Executive Officer ("CEO"). *Id.* ¶¶ 5-6, 23.

GTI is a tech startup that designed case management software for personal injury law firms. *Id.* ¶ 9. Bienville Capital ("Bienville"), a venture capital fund and GTI's largest investor, invested approximately $2 million in GTI between April and May 2023 ("2023 Bienville-GTI Agreement"). *Id.* ¶¶ 10-11. GTI also solicited funds from individual investors, such as Plaintiffs. *Id.* ¶ 15. However, the amount from individual investors did not exceed around $200,000 or $300,000, and GTI relied heavily on Bienville's institutional investment. *Id.*

In 2022, Skoutelas approached Reza Torkzadeh about serving as an advisor for GTI and proposed compensation that included GTI equity. *Id.* ¶ 17. On April 1, 2022, GTI and Reza Torkzadeh entered into an advisory agreement that included equity as consideration for Reza Torkzadeh's services. *Id.* ¶ 18. On March 24, 2023, Skoutelas informed Reza Torkzadeh via email that Bienville intended to purchase most of the equity that would be issued by GTI during the upcoming seed round, leaving only about $250,000 worth of equity for individual investors like Reza Torkzadeh. *Id.* ¶ 20. Subsequently, on July 12, 2023, Reza Torkzadeh purchased 76,190 shares of GTI's "Series Seed-1" preferred shares in exchange for $49,999.69. *Id.* ¶ 21. Reza Torkzadeh retained his shares after the purchase and has not sold or transferred them. *Id.* ¶ 22.

---

[1] The following factual allegations are derived from the allegations in Plaintiffs' First Amended Complaint ("FAC"), unless otherwise indicated. Dkt. 31, FAC. For the purposes of this Motion, the Court treats these factual allegations as true. *See Floyd v. Am. Honda Motor Co., Inc.*, 966 F.3d 1027, 1035 (9th Cir. 2020) ("When ruling on a motion to dismiss, we accept all factual allegations in the complaint as true and construe the pleadings in the light most favorable to the nonmoving party." (citation omitted)).

In May 2024, Skoutelas began soliciting the Torkzadehs for additional investments. *Id.* ¶ 23. On May 24, 2024, Skoutelas emailed Reza Torkzadeh the following: "[W]e have 1-2% of the company at play following our last top-up from Bienville and that would translate to $100K-$200K investment. Are you open to investing in that range?" *Id.* ¶ 24. Based upon this representation, Reza Torkzadeh informed Skoutelas the Torkzadehs were interested in investing in GTI in the amount suggested by Skoutelas in his email. *Id.* ¶ 25.

On June 25, 2024, Skoutelas emailed Reza Torkzadeh that GTI was "working to close some additional capital from [GTI's] lead investor Bienville and [his] participation is key," and asked if Reza Torkzadeh was "comfortable with a $150,000 investment along side [sic] Bienville?" *Id.* ¶ 29. However, Skoutelas never disclosed to the Torkzadehs that Bienville was no longer actively funding GTI and was, in fact, seeking to recoup its investment. *Id.* ¶ 28. Based upon Skoutelas's representations, the Torkzadehs agreed to each invest $75,000 in GTI. *Id.* ¶ 31.

In August 2024, the Torkzadehs executed separate agreements for Simple Agreement for Future Equity ("SAFE") investments. *Id.* ¶ 32; Dkt. 31-1. The Torkzadehs' SAFE Agreements are substantively identical to one another. FAC ¶ 31. Pursuant to these SAFE Agreements, the Torkzadehs agreed to provide funds in exchange for future equity rights. *Id.* ¶ 32. Under their respective SAFE Agreements, the Torkzadehs have the right to certain shares of GTI's Capital Stock, subject to the terms of either an Equity Financing Event, Liquidity Event, or Dissolution Event. *See* Dkt. 31-1, § 1.

The Torkzadehs remained unaware of GTI's financial situation until November 15, 2024, when Skoutelas called Reza Torkzadeh and told him GTI would soon lack the finances to continue operating. *See* FAC ¶¶ 38-39. Prior to this date, GTI never disclosed to Plaintiffs that Bienville was considering, or decided to, back away from its investment or withdraw financial support from the company. *Id.* ¶ 40.

On December 13, 2024, Skoutelas emailed the Torkzadehs various documents regarding the GTI board's decision to dissolve GTI and assign its intellectual property to Fractal Software LLC ("Fractal"). *Id.* ¶ 41. On that same day, Reza Torkzadeh requested information regarding the proposed dissolution pursuant to "his rights as a SAFE holder and shareholder." *Id.* ¶ 44. The

Torkzadehs never received a response. *Id.* ¶ 46. As of January 2025, the transfer to Fractal was "on hold" but not cancelled. *Id.* ¶ 47.

**B. Procedural History**

On June 11, 2025, Plaintiffs filed a Complaint in this Court against Defendants, asserting claims for (1) breach of fiduciary duty, (2) negligence and negligent misrepresentation, (3) fraud, (4) fraud in the connection with the purchase or sale of securities in violation of section 10(b) and Rule 10b-5 of the Securities Exchange Act, (5) breach of contract, (6) breach of the covenant of good faith and fair dealing, (7) unfair business practices, (8) conversion, and (9) violation of California Penal Code section 496. *See* Dkt. 1, Complaint ("Compl.") ¶¶ 32-82.

On November 17, 2025, Defendants filed a Motion to Dismiss. *See* Dkt. 15. On March 25, 2026, the Court granted in part Defendants' Motion to Dismiss ("March 25, 2026 Order"). Dkt. 30, March 25, 2026 Order. The Court denied the Motion to Dismiss as to the breach of contract claim and granted the Motion to Dismiss with leave to amend as to all other claims. *See id.* at 19.

On April 24, 2026, Plaintiffs filed the FAC, asserting claims for (1) breach of fiduciary duty, (2) negligence, (3) fraud, (4) fraud in the connection with the purchase or sale of securities in violation of section 10(b) and Rule 10b-5 of the Securities Exchange Act, (5) negligent misrepresentation, (6) breach of contract, (7) breach of the covenant of good faith and fair dealing, (8) unfair business practices, (9) conversion, and (10) violation of California Penal Code section 496. FAC.

On May 8, 2026, Defendants filed the instant Motion to Dismiss. Motion. On June 3, 2026, Plaintiffs filed an Opposition to the Motion ("Opposition"). Dkt. 36, Opposition. On June 10, 2026, Defendants filed a Reply. Dkt. 38, Reply.

On June 18, 2026, the Court found this matter appropriate for resolution without argument and vacated the hearing set for June 25, 2026. Dkt. 39; *see* Fed. R. Civ. P. 78(b); C.D. Cal. L.R. 7-15. This matter, thus, stands submitted.

///

///

///

## II.

## LEGAL STANDARD

A complaint may be dismissed for failure to state a claim pursuant to Federal Rule of Civil Procedure 12(b)(6) "only where the complaint lacks a cognizable legal theory or sufficient facts to support a cognizable legal theory." *Mendiondo v. Centinela Hosp. Med. Ctr.*, 521 F.3d 1097, 1104 (9th Cir. 2008). In considering whether a complaint states a claim, a court must "construe the pleadings in the light most favorable to the nonmoving party," *Capp v. Cnty. of San Diego*, 940 F.3d 1046, 1052 (9th Cir. 2019) (quoting *Knievel v. ESPN*, 393 F.3d 1068, 1072 (9th Cir. 2005)), accepting as true all factual allegations in the complaint and drawing all reasonable inferences in the nonmoving party's favor, *Moreno v. UtiliQuest, LLC*, 29 F.4th 567, 573 (9th Cir. 2022). The court, however, need not accept as true "a legal conclusion couched as a factual allegation." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)).

Although a complaint need not include detailed factual allegations, it "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Cook v. Brewer*, 637 F.3d 1002, 1004 (9th Cir. 2011) (quoting *Iqbal*, 556 U.S. at 678). A claim is facially plausible when it "allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* The complaint "must contain sufficient allegations of underlying facts to give fair notice and to enable the opposing party to defend itself effectively." *Starr v. Baca*, 652 F.3d 1202, 1216 (9th Cir. 2011).

Generally, leave to amend a dismissed complaint should be freely granted unless it is clear the complaint could not be saved by any amendment. Fed. R. Civ. P. 15(a); *Manzarek v. St. Paul Fire & Marine Ins. Co.*, 519 F.3d 1025, 1031 (9th Cir. 2008).

## III.

## DISCUSSION

Defendants move to dismiss Plaintiffs' FAC, contending Plaintiffs fail to state a claim for (1) breach of fiduciary duty, (2) negligence, (3) fraud, (4) fraud in the connection with the purchase or sale of securities in violation of section 10(b) and Rule 10b-5 of the Securities Exchange Act, (5) negligent misrepresentation, (6) breach of the covenant of good faith and fair dealing, (7) unfair

business practices, (8) conversion, and (9) violation of California Penal Code section 496. *See generally* Motion. For the reasons discussed below, the Court GRANTS IN PART and DENIES IN PART the Motion.

**A. The Delaware Choice-of-Law Provision Applies**

"A federal court sitting in diversity must look to the forum state's choice of law rules to determine the controlling substantive law." *Zinser v. Accufix Rsch. Inst., Inc.*, 253 F.3d 1180, 1187 (9th Cir. 2011), *opinion amended on denial of reh'g*, 273 F.3d 1266 (9th Cir. 2001). Under California law, to determine whether Delaware law is applicable, the Court must consider: "(1) whether the chosen state has a substantial relationship to the parties or their transaction, or (2) whether there is any other reasonable basis for the parties' choice of law." *Nedlloyd Lines B.V. v. Superior Ct.*, 3 Cal.4th 459, 466 (Cal. 1992). If neither of the two tests are met, the inquiry ends. *Id.* A substantial relationship between the choice of law state and the contracting parties exists if a party is domiciled in the state. *Id.* Moreover, a "reasonable basis" for following a choice-of-law provision exists if one of the parties resides in the state. *Id.* "If . . . either test is met, the court must next determine whether the chosen state's law is contrary to a fundamental policy of California." *Id.*

Here, the choice-of-law provision unambiguously provides Delaware law governs the SAFE Agreements. Dkt. 31-1 § 5(f). Specifically, the SAFE Agreements contain the following choice-of-law provision: "All rights and obligations hereunder will be governed by the laws of the State of Delaware, without regard to the conflicts of law provisions of such jurisdictions." Dkt. 31-1 § 5(f).

As an initial matter, the parties offer no reason to modify the Court's conclusion in the March 25, 2026 Order that Delaware law generally controls this action pursuant to the SAFE Agreements' choice-of-law provision. *See* March 25, 2026 Order at 5. Specifically, the FAC repeats the allegations set forth in the original Complaint as to the citizenship of the parties. *See* FAC ¶¶ 3-6. Moreover, "California law broadly construes [the operative] contractual choice-of-law provision." *Gen. Signal Corp. v. MCI Telecomms. Corp.*, 66 F.3d 1500, 1506 (9th Cir. 1995). Thus, because GTI is "domiciled in Delaware as a Delaware corporation, . . . both the reasonable basis and the substantial relationship inquiries are satisfied." March 25, 2026 Order at 5.

Additionally, apart from the causes of action for unfair business practices and violation of California Penal Code section 496, the parties do not dispute whether Delaware law is contrary to a fundamental policy of California. *See* Motion at 14-17; Opposition at 21-25. Therefore, absent any argument to the contrary, the Court finds Delaware law applies to Plaintiffs' remaining claims. *See Aliya Medcare Fin., LLC v. Nickell*, 156 F. Supp. 3d 1105, 1120 n.106 (C.D. Cal. 2015) (finding a contractual choice-of-law provision controlled "[i]n the absence of any argument by the parties" as to the choice of law).

Accordingly, except for the unfair business practices and California Penal Code section 496 claims discussed below, there is no basis to alter the Court's previous finding that Delaware law applies.

### B. Reza Torkzadeh Sufficiently States a Claim for Breach of Fiduciary Duty against Skoutelas (Claim 1)

In the March 25, 2026 Order, the Court determined Reza Torkzadeh failed to adequately plead Defendants owed him a fiduciary duty or that he had a beneficial interest. March 25, 2026 Order at 5-7. With respect to the FAC, Defendants assert "[g]iven Reza [Torkzadeh] has not properly stated a claim for negligent misrepresentation, fraud, or fraud in connection with the sale of securities, his breach of fiduciary duty claim on the same conduct cannot stand." Motion at 10; Reply at 4. Plaintiffs respond the FAC cures the defects outlined in the March 25, 2026 Order. Opposition at 16-17.

"Fiduciary duties are owed by *the directors and officers* to the corporation and its stockholders." *Arnold v. Soc'y for Sav. Bancorp, Inc.*, 678 A.2d 533, 539 (Del. 1996) (emphasis added). "Under Delaware law, *the issuing corporation* does not owe fiduciary duties to its stockholders." *A.W. Fin. Servs., S.A. v. Empire Res., Inc.*, 981 A.2d 1114, 1128 n.36 (Del. 2009) (emphasis added). Further, prospective shareholders are generally not owed a fiduciary duty by either the corporation or its directors and officers, unless there is a "beneficial interest," where the "equitable or beneficial owner possesses an economic interest in the subject property distinct from legal ownership or control." *See Anadarko Petroleum Corp. v. Panhandle E. Corp.*, 545 A.2d 1171, 1176-77 (Del. 1988). A "mere expectancy interest does not create a fiduciary relationship. Before a

fiduciary duty arises, an existing property right or equitable interest supporting such a duty must exist." *Simons v. Cogan*, 549 A.2d 300, 304 (Del. 1988).

Here, Reza Torkzadeh sufficiently states a breach of fiduciary duty claim. First, the FAC alleges "Reza [Torkzadeh] received 20,000 shares" in GTI in October 2022, and "has neither sold nor transferred them." FAC ¶¶ 19, 22. Plaintiffs thus assert Reza Torkzadeh was a stockholder of GTI at the time of the alleged breach. As fiduciary duties are owed by directors and officers to a corporation's stockholders, the FAC sufficiently alleges Skoutelas—GTI's CEO—owed Reza Torkzadeh a fiduciary duty. FAC ¶ 13; *Arnold*, 678 A.2d at 539.

Second, as discussed below, viewed in the light most favorable to Plaintiffs, the FAC sets forth facts establishing Skoutelas breached that duty by misrepresenting GTI's financial state when soliciting investments from Reza Torkzadeh. FAC ¶¶ 51-52, 58-59, 62, 64.

Accordingly, Plaintiffs' breach of fiduciary duty claim is properly pled.

**C. The FAC Sufficiently States a Claim for Negligence (Claim 2)**

In the March 25, 2026 Order, the Court found Plaintiffs failed to state a negligence claim because Plaintiffs failed to allege a duty, besides a fiduciary duty. March 25, 2026 Order at 8. Defendants now argue the FAC fails to state a negligence claim "because pecuniary duties cannot support a negligence claim" and "there was no breach." Motion at 10-11; Reply at 4-5. Plaintiffs respond that the FAC does not rely solely on a pecuniary duty for Plaintiffs' negligence claim. Opposition at 17-18.

"To prevail in a claim for negligence, a plaintiff must establish: (1) the defendant owed the plaintiff a duty of care; (2) the defendant breached that duty; (3) the plaintiff was injured; and (4) the defendant's breach was the proximate cause of the plaintiff's injury." *Campbell v. DiSabatino*, 947 A.2d 1116, 1117 (Del. 2008) (citation modified).

As an initial matter, Defendants' Motion cites Delaware Superior Court Civil Rule 9(b), arguing Plaintiffs are required to "plead particularized facts which establish a legal duty of care." Motion at 11. However, under the *Erie* doctrine, the Federal Rules of Civil Procedure supersede matters of procedural law. *Hanna v. Plumer*, 380 U.S. 460, 465 (1965) ("[F]ederal courts are to apply state substantive law and federal procedural law."). As pleading requirements are matters of

procedure, the Federal Rules of Civil Procedure apply, which require, for negligence claims, only a short and plain statement setting for a plausible claim for relief. *Iqbal*, 556 U.S. at 678; Fed. R. Civ. P. 8(a) ("Rule 8(a)").

Here, Plaintiffs have adequately alleged the existence of a duty. The FAC alleges "Defendants owed duties, including pecuniary duties, to both Plaintiffs." FAC ¶ 71. Plaintiffs also allege Defendants had a "duty to disclose Bienville's withdrawal" of support from GTI. *Id.* ¶ 62. In *Guardian Constr. Co. v. Tetra Tech Richardson, Inc.*, 583 A.2d 1378, 1383 (Del. Sup. Ct. 1990) (quoting Rest. (2d) Torts § 552 (1977)), the Delaware Superior Court found such a pecuniary duty can give rise to a claim for negligence. The court specifically considered section 552 of the Restatement of Torts, which provides that a defendant who "supplies false information for the guidance of others in their business transactions," "in the course of his business, profession or employment, or in any other transaction in which he has a pecuniary interest," "is subject to liability for pecuniary loss caused to them by their justifiable reliance upon the information." *Id.* Although *Guardian Constr. Co.* concerned both negligence and negligent misrepresentation claims, it indicated a pecuniary duty can support a claim for negligence. *Id.*

Thus, the Court finds Plaintiffs' allegation of Defendants' duties to provide accurate information about Bienville's investments in GTI and to disclose Bienville's withdrawal of funding from GTI is sufficient to support Plaintiffs' claim for negligence. FAC ¶¶ 49, 62, 71; *cf. Atwell v. RHIS, Inc.*, C.A. No. 02C-12-003WLW, 2006 WL 2686532, at *1 (Del. Super. Ct. Aug. 18, 2006) (finding a negligence claim where the plaintiff alleged a duty to disclose).

Defendants cite *Vichi v. Koninklijke Philips Elecs., N.V.*, 85 A.3d 725 (Del. Ch. 2014) to argue "a pecuniary duty cannot support a claim for negligence." Motion at 11. However, *Vichi* is silent on the requirements for a negligence claim and thus, is immaterial to Plaintiffs' negligence claim. Rather, *Vichi* merely stands for the proposition that "to be liable for *negligent misrepresentation*, a person must have a pecuniary duty." 85 A.3d at 763 (emphasis added). Thus, *Vichi* is inapposite.

Second, the FAC adequately alleges a breach. Specifically, as discussed below, Plaintiffs allege Defendants knowingly misrepresented GTI's financial state when attempting to obtain

Plaintiffs' investments. FAC ¶¶ 51-52, 58-59, 62, 64. The FAC further alleges Defendants failed to disclose GTI's financial state prior to Plaintiffs' investment, breaching their duty, and causing Plaintiffs to incur damages. *Id.*; *see also id.* ¶¶ 71-73. Therefore, under Rule 8(a), Plaintiffs sufficiently articulate a duty breached by Defendants. *See Iqbal*, 556 U.S. at 678.

Accordingly, Plaintiffs' negligence claim is properly pled.

**D. The FAC Sufficiently States Claims for Fraud, Fraud in Connection with the Purchase or Sale of Securities, and Negligent Misrepresentation (Claims 3, 4, and 5)**

In its March 26, 2026 Order, the Court found Plaintiffs failed to "identify [] specific misrepresentations" in connection with their fraud-related causes of action. March 25, 2026 Order at 10. Defendants argue the FAC again fails to meet the heightened pleading requirement for fraud, fraud in connection with the purchase or sale of securities in violation of section 10(b) and Rule 10b-5 of the Securities Exchange Act, and negligent misrepresentation. *See* Motion at 6-10; Reply at 1-4. Plaintiffs contend the FAC sets forth factual support sufficient to meet the heightened pleading standard. Opposition at 12-17.

Under Delaware law, "[t]o state a claim for fraud, a plaintiff must allege: (1) a false representation made by the defendant; (2) the defendant knew or believed the representation was false or was recklessly indifferent to its truth; (3) the defendant intended to induce the plaintiff to act or refrain from acting; (4) the plaintiff acted or refrained from acting in justifiable reliance on the representation; and (5) damage resulted from such reliance." *Valley Joist BD Holdings, LLC v. EBSCO Indus., Inc.*, 269 A.3d 984, 988 (Del. 2021). Further, "in Delaware, [a] claim of negligent misrepresentation . . . requires proof of all of the elements of common law fraud except that plaintiff need not demonstrate that the misstatement or omission was made knowingly or recklessly. Thus, negligent misrepresentation is essentially a species of common law fraud with a lesser state of mind requirement." *Vichi*, 85 A.3d at 762 (citation modified).

Under Federal Rule of Civil Procedure 9(b) ("Rule 9(b)"), allegations of fraud must be stated "with particularity." Fed. R. Civ. P. 9(b). "Rule 9(b) demands that, when averments of fraud are made, the circumstances constituting the alleged fraud be specific enough to give defendants notice of the particular misconduct so that they can defend against the charge[.]" *Vess v. Ciba-Geigy Corp.*

*USA*, 317 F.3d 1097, 1106 (9th Cir. 2003) (internal quotation marks omitted). Put differently, "[a]verments of fraud must be accompanied by 'the who, what, when, where, and how' of the misconduct charged." *Id.* (citing *Cooper v. Pickett*, 137 F.3d 616, 627 (9th Cir. 1997)); *see also Depot, Inc. v. Caring for Montanans, Inc.*, 915 F.3d 643, 668 n.17 (9th Cir. 2019) ("Rule 9(b)'s particularity requirement 'is a federally imposed rule" that applies "irrespective of whether the substantive law at issue is state or federal.'" (citation modified)).

In addition, when alleging securities fraud under section 10(b) and Rule 10b-5 of the Securities Exchange Act, a plaintiff must allege "(1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation." *Halliburton Co. v. Erica P. John Fund, Inc.*, 573 U.S. 258, 267 (2014). "A statement is false or misleading if it 'directly contradict[s] what the defendant knew at that time' or 'omits material information.'" *In re Cloudera, Inc.*, 121 F.4th 1180, (9th Cir. 2024) (citation modified) (quoting *Glazer Cap. Mgmt., L.P. v. Forescout Techs., Inc.*, 63 F.4th 747, 764 (9th Cir. 2023)). In making this determination, courts apply "the objective standard of a 'reasonable investor.'" *Glazer Cap. Mgmt., L.P.*, 63 F.4th at 764 (quoting *In re Alphabet, Inc. Sec. Litig.*, 1 F.4th 687, 699 (9th Cir. 2021)).

Further, the Private Securities Litigation Reform Act ("PSLRA") provides a section 10(b) claim must "specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on *information and belief*, the complaint shall state with *particularity all facts on which that belief is formed*." 15 U.S.C. § 78u–4(b)(1)(B) (emphasis added). Moreover, to plead scienter, a complaint must "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." *Id.* § 78u–4(b)(2)(A).

1. <u>The May 24, 2024 email satisfies the heightened pleading requirement because Plaintiffs assert the factual basis upon which the false belief is formed.</u>

In the FAC, Plaintiffs allege "on May 24, 2024, Skoutelas represented the following to Reza [Torkzadeh]: '[W]e have 1-2% of the company at play following our last top-up from Bienville and

that would translate to $100K-$200K investment. Are you open to investing in that range?'" FAC ¶ 24. According to Plaintiffs, this email "represented that Bienville continued to back GTI and, in fact, had provided additional funding." *Id.* However, Plaintiffs claim this representation was false because "[o]n information and belief, Bienville's $2 million investment in 2023 represented the entirety of Bienville's investment in [GTI]." *Id.* ¶ 51. Specifically, Plaintiffs allege:

> (1) The 2023 Bienville-GTI Agreement was a "one-time transfer" that "did not provide for future investments";
> (2) There was no "sufficient equity outstanding for Bienville to make another significant investment above and beyond the approximately $2 million invested";
> (3) Skoutelas's March 24, 2023 email indicated "Bienville intended to purchase most of the equity that would be issued by GTI, leaving only about $250,000 worth of equity left, available for individual investors like Reza [Torkzadeh] and others"; and
> (4) "Defendants never took steps that a reasonable start-up would take if they were actually seeking further large investment(s) from an institutional backer. To date, there is no evidence that GTI ever signed another equity agreement, nor any other form of investment agreement (e.g., another 'SAFE' agreement), with Bienville, that would provide for 'top-ups' or new investments from that firm."

*Id.* Plaintiffs also allege that "[o]n information and belief, [GTI] did not receive substantial additional funding from any other source." *Id.* ¶ 52. The basis for this belief includes the following facts:

> (1) The 2023 Bienville-GTI Agreement "did not provide for additional capital contributions from Bienville";
> (2) All or nearly all shares issued by GTI in 2023 were purchased by Bienville and individual investors; and
> (3) "Defendants never took steps that a reasonable start-up would take if they were actually seeking further large investment(s), either from an institutional backer or from individual investors."

*Id.*

Further, Plaintiffs allege "GTI's collapse was due to Bienville's withdrawal," Defendants "had no reasonable basis to claim that Bienville intended further investments," and Defendants "knew that Bienville had no intention to further support GTI" prior to the SAFE Agreements' execution. *Id.* ¶¶ 53-55. Thus, Plaintiffs claim Skoutelas's representation of a "top-up" from Bienville in his May 24, 2024 email constituted a misrepresentation which induced Plaintiffs to invest in GTI. *Id.* ¶¶ 56-59, 62-64.

Here, the Court finds the alleged misrepresentation in the May 24, 2024 email that Bienville continued to back GTI and had provided a "top-up" satisfies the heightened Rule 9(b) pleading standard for Plaintiffs' fraud, securities fraud, and negligent misrepresentation claims. As noted, Plaintiffs, in support of their belief that Skoutelas's representation was false, allege the 2023 Bienville-GTI Agreement did not provide for further investments, there was insufficient equity for subsequent investments by Bienville, GTI only had approximately $250,000 left in equity for individual investors including Reza Torkzadeh as of early 2023, and Defendants never took any steps to secure additional investments from Bienville. *See id.* ¶¶ 51-52. Viewing these facts in the light most favorable to Plaintiffs, the Court finds Plaintiffs sufficiently allege the "facts on which [their] belief" that Skoutelas's representation of a "top-up" in the May 24, 2024 email was false "is formed.". 15 U.S.C. § 78u–4(b)(1)(B); *In re Rockefeller Ctr. Props. Sec. Litig.*, 311 F.3d 198, 217 (3d Cir. 2002) (quoting *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1422 (3d Cir. 1997)). Among other things, Skoutelas's March 24, 2023 email representing there would be only $250,000 left in equity for individual investors after the execution of the 2023 Bienville-GTI Agreement supports a reasonable inference that Bienville's $2 million investment in 2023 represented the entirety of its investment in GTI and, thus, that Bienville did not provide any further "top-ups" to GTI.

Defendants contend Skoutelas's May 24, 2024 email was not a misrepresentation because his reference to a "top-up" "could have been referring to Bienville purchasing some of the remaining shares" in GTI. Reply at 2. In support of this argument, Defendants note "there were approximately 304,762 shares available for purchase" so Bienville was not foreclosed from purchasing shares. *Id.* This argument is unpersuasive. The FAC does not assert Bienville was foreclosed from purchasing shares. Rather, as discussed above, Plaintiffs allege specific facts that, when viewed in the light most favorable to Plaintiffs, establish Bienville did not consider additional investments in GTI and, therefore, that Skoutelas's representation regarding a "top-up" investment was knowingly false. *See* FAC ¶¶ 51-52, 58-59, 62, 64.

Defendants further contend Skoutelas's reference to a "top-up" does not necessarily equate to Bienville making further investments and instead could have "refer[red] to Bienville's previous

significant investments in [GTI].” Motion at 9. However, viewing the facts alleged in the FAC in the light most favorable to Plaintiffs, the Court finds Plaintiffs sufficiently allege facts establishing Skoutelas’s representation regarding a “top-up” from Bienville “conveyed a false or misleading impression” of Bienville’s continued backing of and investment in GTI. *In re Convergent Techs. Sec. Litig.*, 948 F.2d 507, 512 (9th Cir. 1991). Specifically, a reasonable investor could have interpreted Skoutelas’s reference to a “top-up” as “[a]n additional or supplementary element or amount” of investment from Bienville, above the $2 million under the 2023 Bienville-GTI Agreement. *See Top-up*, Oxford English Dictionary Online, https://www.oed.com/dictionary/top-up_n (last visited July 16, 2026). To the extent Defendants argue for a competing meaning of “top-up” in the May 24, 2024 email, the Court declines to resolve this dispute in interpretation at the pleading stage. *See In re Eargo, Inc. Sec. Litig.*, 656 F. Supp. 3d 928, 945 (N.D. Cal. 2023) (“Perhaps an investor would interpret the phrase as Plaintiffs suggest. Or perhaps it wouldn’t. At the pleadings stage, however, the Court cannot make this factual determination.”); *cf. In re Alphabet, Inc. Sec. Litig.*, 1 F.4th at 700 (“Resolving materiality as a matter of law is generally appropriate ‘only if the adequacy of the disclosure or the materiality of the statement is so obvious that reasonable minds could not differ.’” (citation omitted)).

2. <u>The June 25, 2024 email satisfies the heightened pleading requirement because Plaintiffs sufficiently allege how the email was false or recklessly indifferent to its truth.</u>

In the FAC, Plaintiffs assert:

> On June 25, 2024, Skoutelas wrote to Reza [Torkzadeh] that [GTI] was “working to close some additional capital from our lead investor Bienville and your participation is key.” In the same email, Skoutelas immediately followed up this representation by asking for a $150,000 investment: “Are you comfortable with a $150,000 investment along side [sic] Bienville?”

FAC ¶ 29. Defendants interpret Skoutelas’s June 25, 2024 email not as a “guarantee that funding occurred” but “only that he was working with Bienville” on soliciting further investments. Motion at 17. In support of this argument, Defendants again contend Bienville was not “prevented from purchasing a portion of the *remaining* shares” after its initial investment. *Id.* at 18.

As stated above, however, the FAC sets forth allegations that there was no conduct taken toward securing additional investments from Bienville or reasonable basis for Defendants' contention that Bienville sought to purchase additional shares in GTI. FAC ¶¶ 51-52, 58-59, 62, 64. Specifically, Plaintiffs allege "Defendants never took steps" toward securing additional funding, there was insufficient equity for additional investments by Bienville, Skoutelas sought to distribute the remaining shares to individual investors like the Torkzadehs, and there is "no evidence" that future investments from Bienville were forthcoming. *Id.* ¶¶ 51-52. Viewing these facts in the light most favorable to Plaintiffs, the Court finds Plaintiffs sufficiently allege the June 25, 2024 email "was false or was recklessly indifferent to [the] truth," Fed. R. Civ. P. 9(b), and the basis for their belief that the email was false, *see* 15 U.S.C. § 78u–4(b)(1)(B).

Accordingly, Plaintiffs' fraud, fraud in connection with the purchase or sale of securities in violation of section 10(b) and Rule 10b-5 of the Securities Exchange Act, and negligent misrepresentation claims are properly pled.

### E. The FAC Sufficiently States a Claim for Breach of the Covenant of Good Faith and Fair Dealing in the Alternative (Claim 7)

In the March 25, 2026 Order, the Court found Plaintiffs' breach of the covenant of good faith and fair dealing claim was premised on the same facts supporting their breach of contract and fraud claims. March 25, 2026 Order at 16. As such, the Court concluded "Plaintiffs can only state a violation of the breach of covenant of good faith and fair dealing in the alternative." *Id.* With respect to the FAC, Defendants assert the purported misrepresentations cannot support Plaintiffs' claim as they occurred *prior* to the SAFE Agreements' execution. Motion at 13; Reply at 5. Specifically, Defendants argue: (1) "statements made prior to execution of an agreement cannot support a claim for breach of an implied covenant of that same agreement"; and (2) "despite Plaintiffs' contention that [GTI] disposed of its assets to their detriment, their own allegations contradict."[2] Motion at 13.

---

[2] Plaintiffs do not challenge Defendants' first contention. Since Defendants' alleged misrepresentations occurred in May and June 2024—prior to the SAFE Agreements' execution in August 2024—such misrepresentations cannot substantiate a breach of covenant claim as the Agreements had yet to exist. *See* FAC ¶¶ 24, 26, 29.

Plaintiffs respond that the FAC cures the defects set forth in the March 25, 2026 Order and the FAC states a cognizable claim. Opposition at 19.

"The implied covenant of good faith and fair dealing is the doctrine by which Delaware law cautiously supplies terms to fill gaps in the express provisions of a specific agreement." *Allen v. El Paso Pipeline GP Co.*, 113 A.3d 167, 182-83 (Del. Ch.), *judgment entered*, (Del. Ch. 2014), *aff'd*, No. 399, 2014, 2015 WL 803053 (Del. Feb. 26, 2015). "[B]ecause the implied covenant is, by definition, *implied*, and because it protects the *spirit* of the agreement rather than the form, it cannot be invoked where the contract itself expressly covers the subject at issue." *Cygnus Opportunity Fund, LLC v. Washington Prime Grp., LLC*, 302 A.3d 430, 458 (Del. Ch. 2023) (quoting *Fisk Ventures, LLC v. Segal*, No. CIV.A. 3017-CC, 2008 WL 1961156, at *10 (Del. Ch. May 7, 2008)). Thus, if the "language of the contract expressly covers a particular issue," then the implied covenant "will not apply." *Id.*

First, as stated in the March 25, 2026 Order, pursuant to Federal Rule of Civil Procedure 8(d)(2), a party may "set forth inconsistent statements either alternatively or hypothetically within a single count or defense, or in separate claims or defenses." March 25, 2026 Order at 16. Here, the FAC alleges the breach of covenant claim "in the alternative." FAC ¶ 102. Thus, Plaintiffs have cured the defect identified in the March 25, 2026 Order, and their breach of the covenant of good faith and fair dealing claim is adequately pled.

Second, even if Plaintiffs did not plead the breach of covenant claim in the alternative, Plaintiffs have provided independent grounds for the claim. Specifically, the FAC alleges Defendants "violated the covenant" by "committing fraud and disposing of GTI's assets in a way that would benefit its primary shareholder (Bienville) to Plaintiffs' detriment." *Id.*; *see id.* ¶ 41 (detailing "a decision by GTI's board to dissolve GTI and assign its [intellectual property ("IP")] to a company named 'Fractal Software LLC'"—a company owned and controlled by Bienville); *id.* ¶¶ 42-43 (stating GTI's IP was assigned to Bienville for free rather than used to pay off debtors).

To the extent Defendants assert Plaintiffs' allegations regarding the disposition of GTI's assets are contradictory, the Court finds this argument unavailing. The SAFE Agreements provide an investor's right to receive its cash-out payment in a liquidation event shall be "[o]n par with

payments for other . . . Preferred Stock." Ex. A, § 1(d)(iii), FAC. The FAC alleges Bienville received preferred stock, FAC ¶ 11, and Defendants circumvented the SAFE Agreements during the December 2024 liquidation by giving GTI's IP to Bienville prior to calculating a payout to equity holders, *id.* ¶¶ 41-43. Opposition at 19. Notably, the FAC alleges Defendants' "assets were sufficient to pay off GTI's debtors and have $15,000 in remaining funds"—such that Defendants did not need to assign the IP to Bienville. *Id.* ¶ 42.

Further, the FAC's allegations are not contradictory. Although Plaintiffs allege the IP transfer to Bienville is "on 'hold' but [] not cancelled", *id.* ¶ 47, Plaintiffs also allege Defendants announced and documented the transfer, and there is no documentation that the transfer was cancelled despite Plaintiffs' request for information, *id.* ¶¶ 44-46. It is thus plausible and not contradictory to conclude "the transfer occurred or will occur absent court intervention." Opposition at 20. Hence, taken as true, transferring the IP when Defendants had sufficient assets to pay out Bienville breaches "the *spirit* of the agreement rather than the form." *Cygnus Opportunity Fund, LLC*, 302 A.3d at 458.

Accordingly, Plaintiffs' breach of the covenant of good faith and fair dealing claim is properly pled.

**F. The FAC Sufficiently States Claims for Unfair Business Practices and Violation of California Penal Code Section 496 (Claims 8 and 10).**

In the Court's March 25, 2026 Order, the Court found the parties failed to present binding authority governing when statutory causes of action under California law are permitted when Delaware law controls an action. March 25, 2026 Order at 17-18. With respect to the FAC, Defendants contend Plaintiffs "cannot bring" California statutory claims and their claims are "predicated" on insufficient fraud allegations. Motion at 14; Reply at 6-7. Plaintiffs argue they have sufficiently alleged fraud and they are permitted to bring California statutory claims. Opposition at 21.

California Business and Professional Code section 17200 prohibits unlawful, unfair, or fraudulent business acts or practices and any unfair, deceptive, untrue, or misleading advertising. Cal. Bus. & Prof. Code § 17200 *et seq*. Under California Penal Code section 496(c), "[a] plaintiff who has been injured by receipt of stolen property may recover treble damages and attorney's

fees . . . when property has been obtained in any manner constituting theft." *Siry Inv., L.P. v. Farkhondehpour*, 13 Cal.5th 333, 361 (2022).

1. Plaintiffs are not precluded from asserting California statutory causes of action.

As an initial matter, as discussed above, it is undisputed that the SAFE Agreements contain a clear choice-of-law provision providing for the application of Delaware law. Dkt. 31-1 § 5(f).

Under the Restatement (Second) of Conflict of Laws, which is followed by both California and Delaware, there are "strong policy considerations favoring the enforcement of freely negotiated choice-of-law clauses." *Nedlloyd*, 3 Cal.4th at 462; *see NuVasive, Inc. v. Miles*, No. CV 2017-0720-SG, 2020 WL 5106554, at *9 n.119 (Del. Ch. Aug. 31, 2020). Thus, Delaware law shall apply unless it is "contrary to a *fundamental* policy of California." *Nedlloyd*, 3 Cal.4th at 466. "If California has a materially greater interest than the chosen state, the choice of law shall not be enforced, for the obvious reason that in such circumstance we will decline to enforce a law contrary to this state's fundamental policy." *Id.*

Neither party presents binding authority governing when statutory causes of action specific to another state are permitted. However, Plaintiffs provide persuasive authority, where a Delaware court found California has the "strongest contacts for claims" involving "alleged injuries" that occurred in California. *NuVasive*, 2020 WL 5106554, at *9 n.119. California courts have also held California has an important interest in applying its consumer protection laws. *Am. Online, Inc. v. Superior Ct.*, 90 Cal. App. 4th 1, 20 (2001) ("[T]he choice of law provision is not to be enforced if California has an interest in having its own law applied to the dispute.").

Here, the Court does not find reason to preclude Plaintiffs from asserting California statutory claims despite the SAFE Agreements' choice-of-law provision. This action derives from alleged injuries and conduct occurring in California and resulting in harm to California residents. FAC ¶¶ 3-4, 27, 84. California thus has a strong interest in addressing injuries to its residents and applying its consumer protection laws. *Am. Online, Inc.*, 90 Cal. App. 4th at 20. Moreover, the Court is unaware of laws similar to California Business and Professional Code section 17200 and California Penal Code section 496 "in Delaware providing civil remedies for theft, let alone one that provides such significant remedies." Opposition at 25. Thus, the Court is not inclined to dismiss Plaintiffs' unfair

business practices and California Penal Code section 496 claims based on the SAFE Agreements' choice-of-law provisions. *See, e.g.*, *Aliya Medcare Fin., LLC*, 156 F. Supp. 3d at 1132 (declining to dismiss California statutory causes of action based on a choice-of-law provision); *Pro Water Sols., Inc., v. Angie's List, Inc.*, No. CV 19-08704-ODW-SSx, 2021 WL 4288520, at *11-12 (C.D. Cal. Sep. 21, 2021) (same).

2. <u>The FAC sufficiently states unfair business practices and California Penal Code section 496 claims.</u>

As discussed above, the FAC adequately pleads facts regarding Defendants' fraudulent conduct concerning GTI's investments. As a result of the purported fraudulent conduct, Defendants are alleged to have improperly "retained the entire $150,000 in funds belonging to Plaintiffs and converted Plaintiffs' funds." FAC ¶ 117. The FAC thus pleads Defendants are in receipt of stolen property. *Id.* ¶ 118.

Accordingly, taken together, Plaintiffs' unfair business practices and California Penal Code section 496 claims are properly pled.

**G. The FAC Fails to State a Conversion Claim (Claim 9).**

In the March 25, 2026 Order, the Court found Plaintiffs' conversion claim was insufficiently pled because it arose from the same underlying facts as the breach of contract claim. March 25, 2026 Order at 13-15, 18. With respect to the FAC, Defendants reiterate Plaintiffs' conversion claim "arises from the same allegations as its breach of contract claim" and thus, "is not based on an independent legal duty." Motion at 14; Reply at 5-6. Plaintiffs respond that their conversion claim is separate from their breach of contract claim. Opposition at 20-21.

> Conversion is 'any distinct act of dominion wrongfully exerted over the property of another, in denial of [the plaintiff's] right, or inconsistent with it.' Where, however, the plaintiff's claim arises solely from a breach of contract, the plaintiff 'generally must sue in contract, and not in tort.' Thus, in order to assert a tort claim along with a contract claim, the plaintiff must generally allege that the defendant violated an independent legal duty, apart from the duty imposed by contract.

*Kuroda v. SPJS Holdings, LLC*, 971 A.2d 872, 889 (Del. Ch. 2009) (first quoting *Drug, Inc. v. Hunt*, 168 A. 87, 93 (Del. 1933); and then quoting *Data Mgmt. Internationale, Inc. v. Saraga*, No. CIV.A. 05C-05-108, 2007 WL 2142848, at *3 (Del. Super. Ct. July 25, 2007)).

Here, Plaintiffs allege Defendants failed to honor the SAFE Agreements' payment terms. FAC ¶ 98. Specifically, Plaintiffs assert "GTI's decision, in or around December 2024, to dissolve, wind-down, and assign its intellectual property to Fractal" contravened the SAFE Agreements since GTI had at least $15,000 available for disbursement, yet chose to assign its IP—its most valuable asset. *Id.* ¶¶ 42, 97. Thus, the conversion claim is based on the same December 2024 GTI decision and the fact, according to Plaintiffs, Defendants improperly withheld funds despite their demands for return of property. *Id.* ¶¶ 110-11.

Plaintiffs attempt to distinguish the breach of contract and conversion claims by stating that the breach of contract is based on "Defendants' failure to disburse any assets" while the conversion claim is "based on Defendants' attempts to dilute the assets available to Plaintiffs and other investors in Bienville's favor." Opposition at 20. However, both claims derive from the same alleged failure to disburse GTI's assets in accordance with the SAFE Agreements. As a result, Plaintiffs have not pled that Defendants violated an independent duty. *Cf. Kuroda*, 971 A.2d 872 at 890 (dismissing conversion claim where "[t]he only right articulated . . . is [the] right to the money pursuant to the contract").

Accordingly, Plaintiffs' conversion claim is DISMISSED. Additionally, because Plaintiffs have had an opportunity to amend this cause of action and have again failed to plead an independent duty, the Court determines leave to amend would be futile. *Crowley v. Bannister*, 734 F.3d 967, 977-78 (9th Cir. 2013).

///

///

///

///

///

///

**IV.**

**CONCLUSION**

In light of the foregoing, the Court GRANTS IN PART and DENIES IN PART Defendants' Motion to Dismiss, Dkt. 33, and ORDERS as follows:

1. Plaintiffs' Ninth Cause of Action (Conversion) is DISMISSED WITH PREJUDICE.
2. Defendants shall file an Answer to the surviving claims in the FAC no later than fourteen (14) days from the date of this Order.

IT IS SO ORDERED.

Dated: July 21, 2026

KENLY KIYA KATO

United States District Judge